**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DAVID TOM,** individually and on behalf of all others similarly situated, | Case No. 1:25-cv-00566-GTS-DJS |
| *Plaintiff,* | **CLASS ACTION** |
| *v.* | **JURY TRIAL DEMANDED** |
| **DELANCEY STREET GROUP LLC** | |
| **and** | |
| **MJA HOLDINGS, INC. d/b/a MCA JUSTICE** | |
| *Defendant.* | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
MJA HOLDINGS, INC.'S MOTION TO DISMISS**

I.    CONTENTS

II.    **Introduction** ........................................................................................................... 1

III.    **Factual Background** ............................................................................................ 3

IV.    **Legal Standard** .................................................................................................... 4

V.    **Argument** .............................................................................................................. 4

A.    The TCPA applies to text messages. ............................................................. 4

B.    The Plaintiff's number is residential. ........................................................... 14

C.    The Plaintiff received more than one text message. ..................................... 16

D.    Venue is proper because both Defendants are subject to jurisdiction here and have offices here. 22

VI.    **Conclusion** .......................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**

*Aerotel Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189 (S.D.N.Y. 2000) .............................................. 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................. 4

*Atkinson v. Choice Home Warranty*, No. CV 22-04464, 2023 WL 166168 (D.N.J. Jan. 11, 2023) .............................................. 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................. 4

*Bird v. Pro Star Builders, Inc.*, No. 2:22-cv-03610, 2022 WL 18216007 (C.D. Cal. Nov. 28, 2022) .............................................. 21

*Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984 (S.D. Fla. Sept. 19, 2025) .............................................. 14

*Bradley v. DentalPlans.com*, No. CV 20-1094-BAH, 2024 WL 2865075 (D. Md. June 6, 2024) .............................................. 17, 20

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) .............................................. 11

*Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195 (S.D.N.Y. 2024) .............................................. 2, 6, 9

*Chennette v. Porch.com, Inc.*, 50 F.4th 1217 (9th Cir. 2022) .............................................. 16

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006) .............................................. 23

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) .............................................. 22

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012) .............................................. 7

ii

*Dawson v. Porch.com*, 2024 WL 4765159 (W.D. Wash. Nov. 13, 2024) …...................................... 11

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) …...................................... 7

*Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391 (D. Mass. 2017) …...................................... 18, 20

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005) …...................................... 23

*Harriel v. Bealls, Inc.*, No. 8:25-cv-1165, 2025 WL 2379617 (M.D. Fla. Aug. 15, 2025) …...................................... 14

*Haywood v. Fremont Inv. & Loan*, No. 08 CIV. 4961 (BMC), 2009 WL 706090 (E.D.N.Y. Mar. 16, 2009) …...................................... 15

*Hulce v. Zipongo, Inc.*, 132 F.4th 493 (7th Cir. 2025) …...................................... 7

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) …...................................... 23

*Jones v. Blackstone Med. Services, LLC*, 2025 WL 2042764 (C.D. Ill. July 21, 2025) …...................................... 3, 8

*Kerson v. Vermont Law School, Inc.*, 79 F.4th 257 (2d Cir. 2023) …...................................... 5

*Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-CV-2087, 2024 WL 4198134 (N.D. Ohio Sept. 16, 2024) …...................................... 14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) …...................................... 2–3, 13

*Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992 (N.D. Cal. July 12, 2024) …...................................... 14, 16

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025) …...................................... 2–3

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012) …...................................... 7

*Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823 (N.D. Ill. Dec. 7, 2022) …...................................... 21

*Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir. 2009) …...................................... 5, 7, 9

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) …...................................... 5, 8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) …...................................... 5, 9

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) …...................................... 10

*Pfizer, Inc. v. Gov't of India*, 434 U.S. 308 (1978) …...................................... 6

*Rouviere v. DePuy Orthopaedics, Inc.*, 471 F. Supp. 3d 571 (S.D.N.Y. 2020) …...................................... 24

*Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024) …...................................... 10

iii

*Saunders v. Dyck O'Neal*, 319 F. Supp. 3d 907 (W.D. Mich. 2018) …..................................... 9

*Seven County Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025) …..................................... 14

*Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378 (E.D. Pa. Apr. 5, 2019) …..................................... 17

*Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485 (E.D. Pa. Mar. 14, 2025) …..................................... 15

*Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727 (N.D. Ill. 2014) …..................................... 20

*United States v. Paulson*, 68 F.4th 528 (9th Cir. 2023) …..................................... 12

*United States v. Santiago*, 268 F.3d 151 (2d Cir. 2001) …..................................... 19

*Weiss v. Premier Techs.*, No. 21-CV-4648 (JPO), 2022 WL 3354673 (S.D.N.Y. Aug. 12, 2022) …..................................... 24

*Wilson v. Hard Eight Nutrition LLC*, No. 6:25-cv-144, 2025 WL 1784815 (D. Or. June 27, 2025) …..................................... 6, 15

*Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376, 2025 WL 2029274 (D. Or. July 21, 2025) …..................................... 7–8, 9

**Statutes**

18 U.S.C. § 922(g) …..................................... 19

28 U.S.C. § 1391(b)(1), (c)(2), (d) …..................................... 22

28 U.S.C. § 1404(a) …..................................... 23

28 U.S.C. § 1406(a) …..................................... 23

47 U.S.C. § 153(53), (54) …..................................... 10

47 U.S.C. § 227(a)(4) …..................................... 6, 10

47 U.S.C. § 227(b), (b)(1)(A)(iii) …..................................... 7, 9

47 U.S.C. § 227(c) …..................................... 2

47 U.S.C. § 227(c)(3) …..................................... 2, 6

47 U.S.C. § 227(c)(5) …..................................... 17

47 U.S.C. § 332(c)(1)(A) …..................................... 10

**Other Authorities**

16 C.F.R. § 310.4(b)(1)(iii) …..................................... 11

47 C.F.R. § 64.1601(e) …..................................... 3

47 C.F.R. §§ 64.1200(c)(2), (e) …..................................... 2, 6, 13

Do Not Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 § 3 (2003) …..................................... 11

Fed. R. Civ. P. 8(a)(2) …..................................... 4

In re Rules & Regulations Implementing the TCPA, 18 FCC Rcd. 14014 (2003) …..................................... 2, 7, 11

iv

In re Targeting & Eliminating Unlawful Text Messages, 38 F.C.C. Rcd. 12247 (2023) …..................................... 12–13

In re Targeting & Eliminating Unlawful Text Messages, 88 Fed. Reg. 20800 (2023) …..................................... 12

Inquiry Into the Policies… 47 Fed. Reg. 21868-02 (1982) …..................................... 9

## II.   INTRODUCTION

The Telephone Consumer Protection Act's provisions authorizing a nationwide Do Not Call List, 47 U.S.C. § 227(c), empower the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," *id.* § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on that list. *Id.* § 227(c)(3)(F). For decades, the FCC, pursuant to that mandate and by operation of regulatory law, and not mere advisory rulemaking, has consistently made those protections of the TCPA available to all residential phone subscribers, including cellular telephones that receive text messages. *See* 47 C.F.R. §§ 64.1200(c)(2), (e) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers."); *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14037 ¶¶ 33–36 (2003).

In the decades since FCC established the Do Not Call List (DNC) and began enforcing those protections, over 200 million phone subscribers have come to rely on them. *See Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203–204 & n.5 (S.D.N.Y. 2024). Plaintiff is one of them. When Defendant MJA sent him telemarketing texts in willful violation of the TCPA's Do Not Call List protections to sell Delancey Streeet's services, he brought this lawsuit to vindicate his rights and the rights of others harmed by Defendants' intrusive and unwanted telemarketing practices. MJA now moves to dismiss, reasoning that text messages are not covered by the TCPA. The Supreme Court recently held that courts are not automatically bound by the FCC's interpretations, and should make their own assessment of what the TCPA means. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). MJA would have this Court take that opportunity to hold-contrary to numerous other courts that have agreed with the FCC's interpretation and

congressionally-authorized rulemaking both before and after *McLaughlin*-that the DNC protects only traditional landline phone subscribers and does not apply to text messages, an interpretation that would upend protections for hundreds of millions of Americans.

That would be error. The fresh look authorized by *McLaughlin* confirms that the FCC's longstanding regulatory position adheres to the ordinary, contemporary meaning of the terms Congress used in the TCPA's Do Not Call List provision, § 227(c). That conclusion follows from § 227(c)'s broad definition of a prohibited "telephone solicitation" a functional definition of a "residential telephone subscriber" that focuses on the use of a phone, not its physical characteristics or location.  It is reinforced by additional textual evidence in the form of updates Congress made to the TCPA's terms after its 1991 enactment and the FCC's establishment of a national Do Not Call List in 2003. And all this shows that Congress expressly delegated this question to the FCC to decide. So either way, the FCC's statutory regulations "effectuate the will of Congress." *Loper Bright*, 603 U.S. at 371.

To be sure, as MJA seizes on, a single Court, the Central District of Illinois, has held that the TCPA does not apply to text messages because text messages did not exist in 1991. *Jones v. Blackstone Med. Services, LLC*, 2025 WL 2042764, at *3 (C.D. Ill. July 21, 2025). That decision is now on appeal. Moreover, *Jones* cannot be right because it does not appropriately grapple with the updates that Congress made to the TCPA's terms after its 1991 enactment and the FCC's own promulgated regulations contained in 47 C.F.R. §§ 64.1200(e), which explicitly applies to text messages to cell phones or the additional analysis and authority that the Plaintiff advances here. This Court should do exactly what the Supreme Court has directed: "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin*, 606 U.S. at 168.

2

Finally, MJA's other big swing is an even bigger miss. As with Defendant Delancey Street, MJA attempts to transfer venue by arguing that venue is improper, but venue is unquestionably proper here in the Northern District of New York. So that's not a reason to dismiss or transfer this case, either. This Court should deny MJA's motion to dismiss.

### III.   FACTUAL BACKGROUND

Plaintiff David Tom is a private individual and consumer whose personal cellular telephone number, 321-XXX-XXXX, has been registered on the National Do Not Call Registry since June 2003. (Am. Compl. ¶ 19, 26). The number is assigned and billed in Plaintiff's personal name and is assigned to a consumer wireless service, not to a telephone exchange service for businesses. (Am. Compl. ¶ 21, 22). Despite Plaintiff's registration on the National Do Not Call Registry and his prior opt-out request to Delancey Street in 2022, (Am. Compl. ¶ 28), Plaintiff received over eight unsolicited telemarketing text messages from Defendant MJA Holdings, acting under the fictitious name "MCA Justice," beginning in March 2025. (Am. Compl. ¶ 29). Those messages were sent to encourage the purchase of Delancey Street's services. (Am. Compl. ¶ 38, 39). These messages also failed to transmit accurate or required caller identification information. Instead of transmitting Delancey Street's or MJA's name, the CNAM displayed only a geographic location such as "BABYLON NY," even though their carrier Bandwidth made accurate CNAM functionality available. (Am. Compl. ¶ 30-32). Plaintiff replied to the messages with the plain instruction "Don't text me email me only" and requested they stop, but received further texts in violation of his request. (Am. Compl. ¶ 37). Venue is proper in this District because Delancey Street has its registered office in Albany, and both Defendants are residents of the State of New York for personal jurisdiction purposes. (Am. Compl. ¶ 5-9). On July 14, 2025, Plaintiff filed his Amended Complaint asserting claims under the TCPA's Do Not Call provisions, 47 C.F.R. § 64.1200, and Caller ID transmission rules, 47

3

C.F.R. § 64.1601(e). Defendant thereafter filed its Motion to Dismiss on August 22, 2025. This response follows.

## IV.    LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement" of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests, not detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up). In determining whether a claim is plausible, the court must "draw on its experience and common sense." *Id.* at 678. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## V.    ARGUMENT

*A.    The TCPA applies to text messages.*

MJA's primary argument is that the text of § 227(c) forecloses the FCC from granting Do Not Call List protections to telephone subscribers who receive text messages. MTD at 9–19. That's incorrect. MJA is correct that, unless otherwise defined, statutory text is given its

4

"[ordinary or plain] meaning" in the relevant context "at the time Congress enacted the statute." *Compare New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *with* MTD at 10 (quoting *Kerson v. Vermont Law School, Inc.*, 79 F.4th 257, 265 (2d Cir. 2023)). But MJA's and *Jones'* interpretation ignores another important admonition: "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

In context, the ordinary meaning of § 227(c)'s text here establishes that Congress authorized the FCC to protect *all* "residential telephone subscribers," including cell phone subscribers and paging subscribers, who receive text "messages." 47 U.S.C. § 227(c)(1). And that remains true even if text messages were not the "particular manifestation of a problem" that was front of mind when the TCPA was first enacted. *Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009). The TCPA's Do Not Call List provisions grant the FCC broad authority "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). As both the FCC and courts have long recognized, the ordinary meaning of the Do Not Call List provision authorizes the FCC to protect cell phone subscribers. *See, e.g.*, 18 FCC Rcd. 14014, 14037 ¶¶ 33–36; *Cacho*, 739 F. Supp. 3d at 203 n.4 (collecting cases). And the FCC has exercised that authority to provide explicit statutory protection in the TCPA's implementing regulations to subscribers who use their wireless telephone numbers to receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers"). All of those decisions accord with the plain meaning of the statute.

Start with what the statute prohibits: unwanted "telephone solicitations." 47 U.S.C. § 227(c)(3). "Telephone solicitation" is a defined term in the TCPA. *Id.* § 227(a)(4). In essence, it means "a telephone call or message" "which is transmitted to any person" for commercial purposes, subject to certain exceptions. *Id.*[1] Text messages to cell phones fit that definition. First, to state the obvious, a cell phone is a "telephone." *See, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (using the phrase "cellular telephone"). The word "message" suggests that Congress had no particular technology in mind: "Message" means "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*, from one person to another." Black's Law Dictionary, 6th Ed. (1991) (emphasis added). And Congress's use of the word "transmitted" also conveys no preference for wires: "Transmit" means "to send a signal *by radio waves or by wire*." Transmit, Webster's College Dictionary (1991) (emphasis added). Finally, "any person" has a "naturally broad and inclusive meaning." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 (1978). So, a "telephone solicitation" clearly can be received on any kind of telephone in any manner.

In context, the ordinary meaning of § 227(c)'s text here establishes that Congress authorized the FCC to protect *all* "residential telephone subscribers," including cell phone subscribers. 47 U.S.C. § 227(c)(1). For starters, a "subscriber" is anyone who gets a bill in exchange for service. *See Cacho*, 739 F. Supp. 3d at 206. So, a person can be a "telephone subscriber" to any telephone service, either wired or wireless. *Id.*; *Wilson v. Hard Eight Nutrition LLC*, No 6:25-cv-144, 2025 WL 1784815, at *5 (D. Or. June 27, 2025).

---

[1] Here is the full definition: "The term 'telephone solicitation' means the initiation of *a telephone call or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, *which is transmitted to any person*, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4) (emphases added).

And that remains true even if text messages were not the "particular manifestation of a problem" that was front of mind when the TCPA was first enacted. *Nat'l Cable & Telecom. Ass'n*, 567 F.3d at 665. It also aligns with the purpose and structure of the TCPA as a whole. "[T]he TCPA is a remedial statute," any ambiguities of which, at the end of the day, "should be construed to benefit consumers." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013). In passing the statute, Congress expressly found that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting Congressional findings). The statute as whole responds to those findings by providing protection from noxious telemarketing practices across a wide range of devices and telephonic communication mediums that receive "messages," everything from traditional landline phones to cell phones, pagers, and fax machines. *See* 47 U.S.C. § 227(b).

So, Congress clearly did not understand "privacy rights" to be the exclusive province of landline phone subscribers receiving voice calls. Recognizing § 227(c)'s protection of privacy rights for cell phone subscribers receiving text messages therefore aligns with the broad sweep of the statute as a whole. More generally, the definition of "telephone solicitation" focuses not on the form of a communication but whether it is made "for the purpose of encouraging" a commercial transaction. *See, e.g.*, *Hulce v. Zipongo, Inc.*, 132 F.4th 493 (7th Cir. 2025). So, Congress presumably referred to "call or message" disjunctively to broadly capture a wide range of potential communication mediums. *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376, 2025 WL 2029274, at *4 (D. Or. July 21, 2025).

7

MJA primarily cites *Jones* for the proposition that the TCPA cannot apply to text messages. But *Jones* is unpersuasive. There, the court held that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Jones*, 2025 WL 2042764 at *4. But *Jones* and its progeny[2] get statutory interpretation wrong in two important ways.

*First*, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime*, 586 U.S. at 114. When there's a mismatch, the contemporary meaning of the text is what controls, not present-day usage. *See id. Jones* goes astray when it reflexively applies present-day intuitions about how text messages are discussed to language from 1991, before the first text message was ever sent. Taken to its logical end, using the word "call" could not refer to a text message sent to a "paging service," the most analogous type of communication in 1991, which is explicitly protected, merely because the practice of texting a pager evolved into the practice of texting a cell phone. Similarly, § 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." *Jones* is thus wrong as a techno-historical matter: a typical paging device in the early 1990s would have displayed an incoming message as written text, usually a phone number to call. So those uses of the word "call" in the TCPA, which apply to messages to pagers, must have encompassed both

---

[2] Plaintiff anticipates that Defendant may cite the Northern District of Florida's recent opinion in *Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477, 2025 WL 2491195, at *2 (N.D. Fla. Aug. 26, 2025) as further support of its own position and the *Jones* holding. As will be explained, *Davis* relies on the same reasoning as *Jones*, improperly substituting modern intuitions for well-reasoned statutory construction to opine as to what the statute does or does not cover.

voice and text message transmissions, too. It would be incongruous for that definition not to continue on to apply to an essentially identical form of communication as technology evolved.

*Second*, it's irrelevant that Congress didn't have text messages specifically in mind in 1991. *See supra* (citing *Oncale*, 523 U.S. at 79; *Nat'l Cable & Telecom. Ass'n*, 567 F.3d at 665). "The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support." *Skopos*, 2025 WL 2029274, at *4. Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Nat'l Cable & Telecom. Ass'n*, 567 F.3d at 665; *see Oncale*, 523 U.S. at 79. All that the *Jones'* reasoning shows is the obvious fact that most residential subscribers still had landlines in 1991 and that text messages to them were not yet "messages" because they had not been invented yet. *See* MTD at 12. But even if that's true, that doesn't mean Congress intended anything to turn on the presence or absence of a physical wire or the sophistication of a device to which a message is sent. *See Cacho*, 739 F. Supp. 3d at 205.

Especially in this context, where Congress knows that telecommunications technology tends to evolve with time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used. *See Saunders v. Dyck O'Neal*, 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018).[3] It is the meaning of those terms that governs, not the specific facts or technology that Congress would have had in mind in 1991. *Id.* As just explained, the statute *does*

---

[3] In fact, even in 1991, an interpretation that hinged on the involvement of wires would have been strange. Cordless phones were already in widespread use by 1991. *See* Peter Kerr, Cordless Phones Catching On, New York Times (Feb. 16, 1983), https://www.nytimes.com/1983/02/16/garden/cordless-phones-catching-on.html. And even traditional landline providers were regularly using wireless technology to transmit long-distance calls back then; for example, AT&T transmitted most landline calls from Hawaii to the mainland U.S. by satellite in the 1980s and between states using microwaves. *See Inquiry Into the Policies to be Followed in the Authorization of Common Carrier Facilities to Meet Pacific Telecommunications Needs During the Period 1981-1995*, 47 Fed. Reg. 21868-02.

explicitly cover any "telephone solicitation," which is expressly defined to include any "call or message." 47 U.S.C. § 227(a)(4). "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024) (quoting *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212, (1998)).

Broader statutory context makes Congress's intent even clearer. As cell phones grew more prevalent between 1991 and 2003, Congress legislated several times to clarify the status of cell phones under the TCPA, making clearer and clearer each time that it intends them to be protected. In 1993, Congress declared that cell phone companies would presumptively be treated as "common carriers" for most purposes. 47 U.S.C. § 332(c)(1)(A). That matters here because § 227(c) uses the phrase "common carrier" twice to identify the telephone companies whose "subscribers" would be protected by the Do Not Call List. *See* 47 U.S.C. § 227(c)(3)(B), (C). And, in 1996, Congress updated the definition of "telephone exchange service" to include "comparable services" to traditional services, like text messages, relayed or terminated between subscribers "regardless of the facilities used." 47 U.S.C. § 153(53), (54). And as with "common carrier," the TCPA uses "telephone exchange service" to describe companies providing "[intercommunicating or comparable] service[s]" whose "subscribers" are eligible for Do Not Call List protection. *See* 47 U.S.C. § 227(c)(3)(B). And in 2003, Congress passed the Do Not Call Implementation Act, which sent a clear signal that Congress understood § 227(c) to protect cell phone subscribers. Congress directed the FCC to complete its rulemaking by September 2003, and, in "issuing its rule," to "maximize consistency with" a new FTC regulation: "16 C.F.R. § 310.4(b)." Pub. L. No. 108–10, 117 Stat. 557, § 3. That's significant, because the cited

FTC rule granted do-not-call protection to any "telephone number," without differentiating between wireless and landline numbers or message format. 16 C.F.R. § 310.4(b)(1)(B)(iii).

*Jones* also disregarded the FCC's longstanding interpretation of "call" to include text messages because the FCC, until 2023, had only articulated that interpretation in the context of the statute's autodialer prohibitions. 2025 WL 2042764, at *4–5. But that's unsurprising. The Do Not Call List provisions are built around the defined term "telephone solicitation," which includes a "telephone call or message," so the standalone word "call" is much more extensively used in § 227(b)'s autodialer and robocall prohibitions, or in associated definitional provisions.[4] That's why the FCC first determined that "call" includes text messages in the § 227(b) context, and only more recently memorialized in a formal regulation that "call" has the same meaning in the Do Not Call List context, since that context already addressed a "message." *See* 47 C.F.R. § 64.1200(e); *In re: Targeting and Eliminating Unlawful Text Messages*, 88 Fed. Reg. 20800, 20802 ¶ 6 (2023); *In re: Targeting and Eliminating Unlawful Text Messages*, 38 F.C.C. Rcd. 12247, 12256–57 ¶ 26 (2023). And courts have repeatedly reached the same conclusion. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Dawson v. Porch.com*, 2024 WL 4765159, at *4 (W.D. Wa. Nov. 13, 2024) (collecting cases). Accordingly, the FCC has recognized since 2003 that when the statute says "call," it means not just to traditional voice calls but also modern text messages. 18 F.C.C. Rcd. at 14115 ¶ 165 (defining telemarking calls to "encompass[] both voice calls and text calls to wireless numbers").

But even the extensive use of the word "call" in § 227(b) doesn't mean there's any

---

[4] *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243, 105 Stat. 2394, § 3(a) (using "call" or "calls" in the original text of 47 U.S.C. §§ 227(a)(1), 227(a)(3), 227(b)(1)(A), 227(b)(1)(B), 227(b)(2)(A), 227(b)(2)(B), 227(c)(1)(D), 227(c)(5), 227(d)(1)(A), 227(d)(3)).

daylight between § 227(b) and § 227(c) on this particular question, and *Jones* does not identify any.[5] For that matter, this means that the Supreme Court's holding in *Campbell-Ewald*, 577 U.S. 153, 156 (2016), controls, because absent cause to think otherwise, "a word or phrase is presumed to bear the same meaning throughout a text." *United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023). In fact, reading the word "call" differently in § 227(c)(5) than in neighboring provisions would make no sense. *See, e.g.*, 38 F.C.C. Rcd. at 12257 (rejecting that "anomalous" interpretation). If Congress intended to cabin § 227(c)(5)'s private right of action to *exclude* text messages as "calls," it wouldn't have conveyed that by using a term that elsewhere in the statute *includes* them, as the Supreme Court held in *Campbell-Ewald*.

There is only one other reference to "calls" in § 227(c), and it has the same breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under subsection (a)(3)" (emphasis added). In the original TCPA, subsection (a)(3) contained the statutory definition of "telephone solicitation." *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243, 105 Stat. 2394, § 3(a). So § 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition—which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4); *see supra*.[6]

---

[5] The *Davis* court's decision is similarly unpersuasive because it incorrectly relied on this distinction to adopt an unduly restrictive interpretation of § 227(c)(5).

[6] Because § 227(c)(1)(D) confirms that the slight variation between Congress's use of a "call or message" in § 227(a)(4)'s capacious definition and its use of "call" in § 227(c)(5) is immaterial, *Jones' (and Davis')* reliance on this distinction to adopt a restrictive interpretation of § 227(c)(5) is unpersuasive.

Even if the statute left room to doubt that a text message can be an actionable violation of the Do Not Call List provisions (which it doesn't), the FCC's longstanding interpretations of the words "call" and "message" should still carry the day. As previously explained, the FCC is regulating here with authority expressly delegated by Congress. 47 U.S.C. § 227(c)(1)(A) (tasking the FCC with evaluating approaches); 47 U.S.C. § 227(c)(1)(E) (permitting the FCC to make rules). That language grants discretionary authority to "fill up the details," accompanied by "flexibility" to determine what rules will best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. As explained, Congress in 1993 tasked the FCC with deciding whether cell phone companies are "common carriers" whose subscribers therefore have rights under the TCPA, and again in 1996 to address whether new services, like text messages, provided by them were "exchange services." *Compare* 47 U.S.C. § 332(a)(1)(A), 47 U.S.C. § 153(53), (54) *with* 47 U.S.C. § 227(c)(3). That expressly delegates to the FCC "authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 395.

Acting under that express delegation, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. Even after *Loper Bright* and *McLaughlin*, Congress can still permit an agency to create a definition when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395. Because the FCC acted reasonably and consistently in reaching

13

that conclusion, this Court should affirm that "reasoned decisionmaking." *Id.* at 395.

At minimum, this court should look to the FCC's longstanding and consistent interpretation of the words "call" and "message" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388 (citing *Skidmore*, 323 U.S. at 139–40). The FCC's decisionmaking here was, at the very least, "reasonable and reasonably explained." *Seven County Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497, 1511 (2025) Recognizing as much, courts have continued to defer to the FCC's well-reasoned decision to prohibit text messages to cell phones on the DNC, even after *Loper Bright* and *McLaughlin*, particularly in light of the statutory rulemaking hook contained in 47 C.F.R. § 64.1200(e). *See, e.g., Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984, at *7 (S.D. Fla. Sept. 19, 2025); *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165, 2025 WL 2379617, at *2 (M.D. Fla. Aug. 15, 2025); *Wilson*, 2025 WL 1784815, at *5; *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-CV-2087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024); *Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024). This court should do the same.

B.    *The Plaintiff's number is residential.*

Defendant MJA essentially rehashes the same arguments that Delancey Street has made in its own motion to dismiss, including the specious argument that the Plaintiff uses the subject number as part of his firearms business. In response, Plaintiff reincorporates and realleges each of those arguments as if though fully set forth herein. A few pertinent points, however, bear mentioning. First, as Mr. Tom's previous declaration makes clear, and which is incorporated by reference herein, Mr. Tom does *not* use the subject number for his business, his business has a different number, and the sole reason why his number appears on file with the ATF is as a *personal* phone number that the ATF requires on its forms for exigent circumstances; such number is not used in the regular course of Mr. Tom's business operations. Relatedly, the

14

declaration addresses the additional manifestly incorrect information in MJA's motion, including that the Plaintiff allegedly the number with the ATF on an expired license, which would in any event undercut the Defendant's assertions. *See Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *5 (E.D. Pa. Mar. 14, 2025) (holding that modifying usage of a number from business to non-business purposes or other changes in circumstances can allow a number to become residential). For that matter, it is unclear how MJA could claim to rely on admittedly "expired," MTD at 8, 16, information for its contention that it continually justified in contacting what it thought was a business. *See id.* (holding that telemarketer's reliance on a five-year-old website was not justified to argue that telemarketer believed it was calling a business).

As another matter, and unlike Delancey Street, MJA also challenges the presumptively residential nature of Mr. Tom's cellular phone number. As the Plaintiff made clear in his opposition to Delancey Street's motion, this presumption, by its very definition, is a *factual* dispute that is inappropriate to resolve at the pleadings stage. *Haywood v. Fremont Inv. & Loan*, No. 08 CIV. 4961 (BMC), 2009 WL 706090, at *1 (E.D.N.Y. Mar. 16, 2009) ("[P]resumptions are evidentiary standards that are inappropriate for evaluation at the pleadings stage.") (citing 5B C. Wright & A. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2006)).

The Plaintiff is unquestionably entitled to this presumption at the pleadings stage, contrary to Defendant's representations. Plaintiff's averment that his cell phone is "residential" is not a mere legal conclusion. It may be a plain statement, but it is a simple factual statement. The word "residential" doesn't exclude cell phone subscribers as a matter of law. That meaning of "residential" also aligns with the "express aim" of the Do Not Call List: to protect residential subscribers' "'privacy rights.'" *Wilson*, 2025 WL 1784815, at *6 (quoting 47 U.S.C. § 227(c)(1), (2)). Although those interests "do not depend upon whether the undesired telephone solicitations

15

are received on a cellular phone rather than a landline," *Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024), cellular phones are "presumptively residential," as MJA is forced to concede. MTD at 14. Given that the Plaintiff has pled that he received the messages on his cell phone, he is entitled to the presumption at the pleadings stage that his number is residential. Discovery may allow MJA to rebut that presumption, *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022), but it cannot do so now. *See Haywood*, 2009 WL 706090, at *1.

And to the extent that MJA challenges the Plaintiff's pleading in this regard, such as "allegations as to what Plaintiff uses the phone for, how much he uses the phone for business or employment, who pays the phone bill (or whether phone expenses are deducted as expenses), or any other factors bearing on how a reasonable observer would view the phone line," those are all both averments that Mr. Tom has made in his declaration and would plead, to the extent his pleading is deficient, on amendment. But this Court need not even cross that bridge because, as *Haywood* counsels, those questions, the answers to which may rebut the presumption that the Plaintiff's cell phone is residential, are properly reserved for discovery and jury trial, not the pleadings stage. At the 12(b)(6) stage, courts do not pick sides in a swearing contest. They apply the well-settled rule that where disputed factual and merits questions, the motion must be denied and the case allowed to proceed to discovery.

Like Delancey Street's motion on this point, MJA's motion must likewise fail.

C.      *The Plaintiff received more than one text message.*

MJA relatedly argues that the Plaintiff fails to allege that he received more than one telephone solicitation within a twelve-month period. But as the Plaintiff explains, he received multiple text messages, including after he requested them to stop. The Court's analysis can end there. The Plaintiff has unquestionably pled that he received multiple calls from the same entity-

16

Defendant MJA-within a twelve-month period, to his number on the National Do Not Call Registry, precisely as the statute requires. 47 U.S.C. § 227(c)(5). The purpose of these calls was clearly to advertise Defendant Delancey Street's services. As another Court explained with respect to another TCPA plaintiff, merely feigning interest on the calls is insufficient to establish *prior* consent, "The fact that he "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation." *Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *4 (E.D. Pa. Apr. 5, 2019). Nor can consent be obtained on and during the course of an illegal call. *Bradley v. DentalPlans.com*, No. CV 20-1094-BAH, 2024 WL 2865075, at *15 (D. Md. June 6, 2024). The Courts' decisions in those cases counsels that the Plaintiff may identify that the calls were solicitations by playing along with a caller to ascertain the nature of its sales pitch, exactly as alleged here, not consenting, and then opting out of future calls, also exactly as alleged here. And the calls were clearly solicitations because the Plaintiff was ultimately attempted to be *sold the Defendant Delancey Street's services.*

As a further matter, MJA's argument relies on a faulty reading of the statute that injects a requirement that is not there, and thus relies on an unsupported legal premise. MJA's reading adds words Congress didn't use. The subject provision, 47 U.S.C. § 227(c)(5), provides a right of action to any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." The statute sets out two distinct conditions, a numerosity gate – "more than one telephone call" from the same entity within 12 months, and a violations gate – at least one call in "violation of the regulations" under § 227(c). Nothing in the text says both (or all) of the calls

17

must be violations. If Congress had intended the threshold to be "more than one *violative* call," it knew how to say so. No part of that language requires that more than one of the telephone calls must violate the "regulations prescribed." Were that the case, the statute would be worded differently, making clear that a person must receive "more than one *violative* telephone call."

MJA reads this requirement of a "violative telephone call" into the statute when it is not there, which runs contrary to multiple canons of construction, including the surplusage canon, and the omitted case canon, which forbids adding a requirement Congress did not enact. All the statute requires is that the Plaintiff receive "more than one telephone call." The statute does *not* say that non-violative calls cannot count toward this requirement. They unquestionably can, and MJA cites no case holding otherwise. *See Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391, 397 (D. Mass. 2017). Each requirement is an *independent*, not an interdependent, requirement. Were each requirement interdependent, it would run contrary to the statutory damages hook, which clearly provides recovery for one call.

The syntactic structure supports Plaintiff's reading. As an initial matter, the structure fits § 227(c)(5)(B)'s remedial hook, as that section permits an action to recover a loss "from such *a* violation," singular, not plural, and damages are awarded "for each such violation." "[M]ore than one telephone call . . . by or on behalf of the same entity" states the numeric and source condition, and the postpositive modifier "in violation of the regulations" describes the actionable conduct within that series, without converting the numeric threshold into a "two violations" prerequisite. Grammatically, the phrase is not a neat, parallel series. Rather, it is a complex noun phrase ("more than one telephone call within any 12-month period by or on behalf of the same entity") followed by a postpositive modifier ("in violation of the regulations"). Where there is no straightforward series, the nearest reasonable referent canon warns against stretching a modifier

18

to silently change earlier quantitative terms. The ordinary reading is that the numerosity requirement ("more than one") stands on its own, and the violation clause identifies the wrongful conduct that makes the call(s) actionable. The remedial hook supports this conclusion. To be sure, if it is determined at jury trial that the Plaintiff received only one call that violated the TCPA because he consented to future communications and did not revoke consent, the Plaintiff may not be able to recover for such calls made with consent (because they did not violate the TCPA), but it does not mean that he has failed to satisfy the condition precedent. Congress set a threshold of *calls* (not violations), then measures damages per violation once that threshold is crossed. Congress explicitly allowed recovery for even a single violation. Reading the statute to require two violations would erase the gatekeeping function (the "more than one call" prerequisite) by collapsing it into the violation element and would render "each such violation" needlessly redundant, in addition to contradicting the remedial hook under subsection (c)(5)(B).

Congress often uses a repeat-status gate to screen out certain cases and then ties liability or damages to each violation that occurs once the gate is crossed. This is most often seen in recidivist schemes, such as under the Gun Control Act. For example, in determining a sentence enhancement under 18 U.S.C. § 922(g), the Second Circuit has held that the fact of a prior conviction is not a separate element of the offense but is merely only a conditional threshold relevant to sentencing. *United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001). Once the government proves the repeat-status predicate, it can obtain an enhancement if it proves a present violation, and need not prove two such violations. *Id.* at 155-56. So too here. The statute has a numerosity gate and a violations gate. Reading the numerosity gate to demand two violating calls collapses distinct clauses, contrary to how courts read recidivist/threshold statutes. Put another way, consider a gym that posts a sign, "Anyone who has visited this facility more than once this

month and violates the dress code will be fined." A patron need not break the dress code twice. The repeat visit requirement and violation requirement are two separate, independent conditions.

But even assuming, *arguendo*, that the Plaintiff received only one violative call (which he did not, as he received several), that does not mean that the Plaintiff cannot assert a claim for *that call*, because he has satisfied the initial requirement of "receiv[ing] more than one telephone call," as well as the additional requirement that he receive a call in violation of the "regulations prescribed under this subsection." MJA cites no case holding that non-violative calls cannot count toward the "more than one telephone call" threshold, and its brief simply makes the conclusory statement that no "violative" text exists after an alleged "Yes" reply. That reasoning runs contrary to *Gibbs*, where the circumstances were analogous to that here of the Plaintiff allegedly opting in and then revoking any purported consent:

> SolarCity argues that Colby fails to plead facts sufficient to support Count IV because he alleges he received "at least one" call 30–days after requesting SolarCity stop calling him, but the TCPA requires at least two such calls to state a claim. . . . While Colby pleads he received "at least one call" more than thirty days after he requested SolarCity stop, the complaint further alleges that Colby had repeatedly asked SolarCity to stop calling him for "several months" after his initial home visit, but that his appeals were "fruitless." The complaint alleges numerous unsolicited calls after his first revocation of consent. Certainly "more than one," which is all that is required.

*Gibbs*, 239 F. Supp. 3d at 397. In any event, MJA's premise fails on the pleadings: a consumer's "Yes" to the very solicitations at issue is not a "prior express invitation or permission" under the TCPA, and the immediate reply saying "Don't text me email me only" plausibly revokes any arguable consent, making subsequent calls "violations." *Bradley*, 2024 WL 2865075, at *15.

Thus, the subsequent conduct further supports the conclusion that the Plaintiff received at least two violative calls. *See Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) ("[The plaintiff] has alleged that she received and answered a call from [the telemarketer] in which the caller tried to sell her a Budget Savers membership the day after she received three

20

unanswered calls from [the telemarketer]. The content and timing of the fourth call allows the court to draw a reasonable inference that [the telemarketer] made the first three calls to market [the defendant]'s services."); *Atkinson v. Choice Home Warranty*, No. CV 22-04464, 2023 WL 166168, at *5 (D.N.J. Jan. 11, 2023) ("[W]hile Plaintiff only alleges the specific content of one call, she answered the phone on at least three occasions, claims that Defendant began calling [the plaintiff] on her cellular telephone to sell Plaintiff a home warranty plan, that the calls were for telemarketing purposes, and that Defendant placed calls to [the plaintiff] on numerous occasions attempting to solicit Plaintiff a home warranty plan[.] These allegations create a reasonable inference that more than one of the seven calls explicitly listed were 'telephone solicitations' in violation of the statute."); *Bird v. Pro Star Builders, Inc.*, No. 2:22-cv-03610, 2022 WL 18216007, at *3 (C.D. Cal. Nov. 28, 2022) ("The Court agrees that it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not."); *Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823, at *3 (N.D. Ill. Dec. 7, 2022) ("Moore acknowledges that he never spoke with anyone — including anyone from Healthcare Solutions — during the first call. That said, he points out that both calls came from the same number, on the same day. So, it is reasonable to assume that the same caller made both calls for the same reason. . . . The issue of who made the first call isn't much of a whodunit. Moore received two calls from the same number, and the second caller was Healthcare Solutions. It is reasonable to conclude that Healthcare Solutions called the first time, too. Does Healthcare Solutions share a phone number with someone else? Unlikely.").

In light of the Court's obligation to draw all reasonable inferences in Tom's favor at the pleading stage, it should find it reasonable that the Plaintiff has pled at least two violative calls, even if it holds that the statute requires more than one *violative* call.

21

D.   *Venue is proper because both Defendants are subject to jurisdiction here and have offices here.*

Venue is also proper here in the Northern District of New York. Under the general venue statute, a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). For venue purposes, an entity "resides" in any district where it is subject to personal jurisdiction with respect to the action, and in a State with multiple districts, such as New York, a corporation "resides" in any district where its contacts would suffice for personal jurisdiction as if the district were a separate State; if no district qualifies, it resides in the district with the most significant contacts. 28 U.S.C. § 1391(c)(2), (d). "The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014). Here, Delancey Street is a Delaware corporation with its principal place of business and registered New York office in Albany, which is in this District. Delancey Street has listed no other address with the Secretary of State. And MJA is a New York corporation with its headquarters, principal place of business, and registered address in Huntingdon, NY, which is on Long Island. As such, all defendants are New York residents and subject to the exercise of general personal jurisdiction here. And because at least one defendant (Delancey) resides in this District, and all Defendants are residents of New York, venue is proper under § 1391(b)(1). Delancey's deliberate registration to conduct business in New York and maintenance of a registered New York office in Albany, within the Northern District, and nowhere else, constitutes purposeful, continuing contacts with this District sufficient to establish residency for venue purposes. Given that, on a Rule 12(b)(3) motion, Plaintiff need only make a *prima facie* showing of venue, venue is unquestionably proper in the Northern District, though perhaps not to the exclusion of the Eastern District. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353,

22

356 (2d Cir. 2005) (holding that venue may be proper in more than one District). As a result, venue in the Northern District is not inherently "wrong" or improper under Section 1391 so as to warrant transfer or dismissal under Rule 12(b)(3) or Section 1406(a).

Defendant alternatively argues that this matter should be transferred to the Eastern District of New York, for convenience purposes, under Section 1404(a). Not so. A defendant seeking transfer on convenience grounds bears the heavy burden of showing that the balance of convenience and interests of justice strongly favors transfer, provided that the prerequisite requirement that that the case could have been brought in the proposed transferee district is met. The Second Circuit considers the familiar *D.H. Blair* factors in determining whether a convenience transfer is warranted: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006). Each of these factors weigh against transfer.

As a preeminent consideration, the Plaintiff's choice of forum, here the Northern District of New York, the district where Delancey resides for venue purposes, is appropriate, and has been chosen considering the Plaintiff's and his Counsel's travel considerations that MJA itself points out. In evaluating deference to the Plaintiff's chosen forum, the Second Circuit applies the *Iragorri* "sliding scale," which affords substantial weight where, as here, a plaintiff selects a forum with legitimate ties to the defendants. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). MJA has not made the "strong showing" required to override that choice. *Id.* Turning to the second factor, MJA identifies no specific, non-party witnesses who would be unavailable

in Northern District or beyond the Northern District's subpoena range. Generalized assertions of inconvenience are insufficient. *D.H. Blair*, 462 F.3d at 106-07. Third, this TCPA case turns on electronic records, such as dialling logs, DNC records, policies, and contracts, all electronically accessible from anywhere, and even so, courts in the Second Circuit have held that this factor is minimal in modern litigation. *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents.") (citing *Aerotel Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189, 197 (S.D.N.Y. 2000)).

Turning to the convenience of the parties, the element is, at best, neutral. Both Defendants are New York residents and Delancey Street maintains its registered office in the Northern District. Litigating here imposes no unusual burden on entities already doing business, and thus litigating, statewide. MJA's counsel's "3-5 hour drive" complaint is not the kind of hardship that justifies transfer within the same state, especially weighed against deference to Plaintiff's forum and the availability of Zoom and other forms of remote appearances, as this Court has already conducted telephonically. *Weiss v. Premier Techs.*, No. 21-CV-4648 (JPO), 2022 WL 3354673, at *3 (S.D.N.Y. Aug. 12, 2022) ("[C]ourts have sometimes considered the availability of remote proceedings when weighing transfer of venue."). MJA shows no witness who would be unavailable in the Northern District, and virtual appearances and depositions would reduce overall costs, even when considering the parties' relative means. *See Rouviere v. DePuy Orthopaedics, Inc.*, 471 F. Supp. 3d 571, 574 (S.D.N.Y. 2020); *In re Certa Dose, Inc.*, No. 21-11045 (LGB), 2021 WL 5177376, at *16 (Bankr. S.D.N.Y. Nov. 4, 2021). Relatedly, the locus of operative facts similarly weighs, at best, neutrally. The alleged telemarketing campaign was orchestrated by New York entities and executed via electronic communications. The

24

decisions and records are corporate-level, not district-specific. Any ties to the Eastern District do not meaningfully outweigh the Northern District's ties given Delancey's Albany registration and both parties' nationwide operations. Simply put, this is not the type of strong case for transfer that the Second Circuit requires to override the Plaintiff's chosen and statutorily proper forum. Because venue is proper in the Northern District under § 1391(b)(1), the Court should not transfer under § 1406(a). Defendant's alternative invitation to transfer venue should similarly be rejected as a mere convenience dispute. Because § 1404(a) factors do not favor transfer, either, the Court should deny MJA's Rule 12(b)(3) motion.

## VI.    CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent additional questions remain, it should permit the Plaintiff to amend.

Dated: September 26, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

September 26, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.